**AT & T CORP., on its own behalf and in its capacity as co-maintenance authority on behalf of the cable owners of submarine cable system TAT–10 Petitioner,**

v.

**TYCO TELECOMMUNICATIONS (U.S.) INC. (formerly known as Tycom U.S. Inc.), Respondent.**

No. 02 CIV. 7498(VM).

United States District Court, S.D. New York.

April 4, 2003.

Vincent J. Foley, Holland & Knight, L.L.P., Douglas R. Burnett, Holland & Knight LLP, New York, for AT & T Corp., on its own behalf, AT & T Corp., in its capacity as co-maintenance authority on behalf of the cable owners of submarine cable system TAT–10 petitioners.

## *ORDER*

MARRERO, District Judge.

An arbitration proceeding was conducted pursuant to an Agreement dated August 10, 1998 between Concert Global Network Services, Ltd. in its own capacity and as co-maintenance authority on behalf of the owners (the "Cable Owners") of submarine cable TAT–10 (the "TAT–10") and Tyco Telecommunications (U.S.) Inc. ("Tyco"), formerly known as Tycom U.S. Inc. The TAT–10 is a fiber optic underwater transatlantic telecommunications cable.

AT & T Corp. ("AT & T") is also a co-maintenance authority for the consortium of owners of the TAT–10. On September 17, 2002, AT & T, on its own behalf as well as in its capacity as co-maintenance authority for the Cable Owners, filed a Petition to Confirm Arbitration Award dated September 17, 2002 (the "Petition") and an accompanying Notice of Motion dated September 17, 2002 moving this Court for an Order confirming the arbitration award. Tyco opposes the Petition and notice of motion, and in a Notice of Cross–Motion to Vacate Arbitration Award dated October 2, 2002, Tyco seeks an Order vacating the award. In an Order dated March 31, 2003, this Court confirmed the arbitration award in all respects and indicated that its findings, conclusions, and reasoning would be

set forth separately. For the reasons explained below, the arbitration award is confirmed in all respects, and AT & T is entitled to judgment accordingly.

## I. *BACKGROUND*

Submarine transatlantic cable systems are owned by consortia of telecommunications companies, some of which own stakes in more than one such cable system.[1] Each consortium is governed by various organizational agreements negotiated among its member companies and influenced by industry-wide recommendations about operational procedures, to the extent these recommendations are incorporated into the organizational agreements. Pursuant to these consortium agreements, certain members of these consortia are delegated maintenance, administrative, and operations tasks and, accordingly, are referred to as "co-maintenance authorities." AT & T is a co-maintenance authority for the TAT–10 Cable Owners.

Because these cable systems, which bridge the communications pipeline across the Atlantic Ocean, are limited in number, the various consortia of cable owners apparently find it in their respective interests to arrange with one another and, indeed, other telecommunications companies generally, for contingency measures in the event of unforseen network traffic increases or disruption in traffic flow. These contingency measures are referred to as "restoration plans" and provide for the rerouting of one cable system's traffic over another network under various conditions negotiated between or among the entities involved.

On July 31, 1998, telecommunications on the TAT–10 stopped when a section of the cable in the North Sea was severed by a ship, the M/V Dock Express 20, that operated under a long term charter to a subsidiary of Tyco, which was in the process of plowing a bed and laying an underwater AC–1 cable. When the TAT–10 was severed, contingency measures were initiated for rerouting the affected cable traffic over and across other networks in accordance with the applicable restoration plans. Also, repairs of the damaged cable commenced immediately. The TAT–10 was restored to full operational capacity as of August 14, 1998.

The restoration scheme that was triggered in this case was somewhat involved. In essence, the restoration can be divided into two categories: so-called "wet" restoration, that portion of the rerouting which occurred under and across the Atlantic Ocean; and so-called "backhaul" or "terrestrial" restoration, that portion which occurred over dry land. In this case, wet restoration entailed the rerouting of TAT–10 traffic over another transatlantic submarine cable, the TAT–12/13. Backhaul restoration occurred over three additional networks—owned and operated by AT & T, Deutsche Telekon AG ("DTAG"), British Telecom ("BT"), and Cable & Wireless ("CW"), respectively—at various portions of the cable route. In addition, the various restoration plans in effect at the time of the July 31, 1998 incident involved a prepaid annual allotment of emergency or overflow traffic volume (so-called "annual restoration") with provisions for additional bandwidth as needed in accordance with prenegotiated price schedules (so-called

---

1. The factual recitation presented below is derived primarily from the Affidavit of Douglas Burnett In Support of AT & T's Motion To Confirm the Arbitration Award dated October 16, 2002 ("Burnett Aff."); Affidavit [of Alfred Yudes] In Support Of Cross–Motion To Vacate Arbitration Award dated October 2, 2002 ("Yudes Aff."); and the Final Award dated September 12, 2002 ("Panel Decision" or "Final Award"), *reprinted in* Burnett Aff., Ex. 2. Additional citations to the record appear as necessary.

"ad hoc restoration"). The restoration capacity needed during the period in which the TAT–10 was not operational exceeded the annual restoration allotments.

In an exchange of letters in and around August 1998 between Tyco and the Cable Owners concerning settlement of the matter, Tyco admitted liability but reserved its right to contest damages via an arbitration process. An arbitration panel was constituted as of December 2000 (the "Panel"), and arbitration proceedings commenced soon thereafter. The arbitration proceedings entailed discovery process including the taking of depositions and documentary exchanges, briefing of issues, and seven evidentiary hearings including live witness testimony over the course of approximately one year. The proceedings closed on April 10, 2002. The Panel issued a unanimous Final Award dated September 12, 2002 (the "Panel Decision" or "Final Award") in favor of the Cable Owners in the amount of $5,798,075.83 plus interest at a rate of 4.75 percent accruing on the principal amount of $4,373,101.18 from October 15, 2002, the date by which payment was due. This figure reflects costs incurred both in repairing the damaged TAT–10 and in restoring the affected traffic by rerouting it across other networks during the period in which the TAT–10 was not operational, as well as attorneys' fees and costs. In addition, the Panel's fee for services rendered amounted to $136,000, and the Panel Decision allocated three-quarters of this sum to be paid by Tyco and one-quarter by the Cable Owners.

## II. DISCUSSION

### A. CLAIMS OF LEGAL ERROR

Tyco presents several challenges to the Panel's interpretation and application of relevant legal principles in determining the Final Award. Specifically, Tyco argues that the Panel improperly interpreted the International Convention for the Protection of Submarine Cables (the "Cable Convention"), March 14, 1884, 24 Stat. 989–1000, December 1, 1886, 25 Stat. 1424, July 7, 1887, 25 Stat. 1425, 1 Bevans 89, as authorizing a private cause of action and allowing the recovery of restoration damages; that the Panel disregarded the co-ownership doctrine expressed by the United States Supreme Court in *Brooklyn E. Dist. Terminal v. United States*, 287 U.S. 170, 53 S.Ct. 103, 77 L.Ed. 240 (1932); and that the Panel misconstrued the law of proximate causation in compensating the Cable Owners for prorated annual restoration costs. The Court finds that each of Tyco's claims is without merit.

### 1. Standard of Review

■■■■ Tyco faces a very rigorous burden as it endeavors to disturb an arbitration award based on claims that the arbitrators misapplied the law. The Second Circuit has noted that "[t]he showing required to avoid summary confirmation of an arbitration award is high . . . ." *Willemijn Houdstermaatschappij, BV v. Standard Microsystems Corp.*, 103 F.3d 9, 12 (2nd Cir.1997). Indeed, the Second Circuit recently had occasion to propound on the requirements for vacatur of an arbitration award, instructing that

> an arbitral decision may be vacated when an arbitrator has exhibited a "manifest disregard of law." . . . Our standard of review under this judicially created doctrine is "severely limited." . . . To vacate the award, we must find something beyond and different from a mere error in the law or failure on the part of the arbitrators to understand or apply the law. . . . The party seeking vacatur bears the burden of proving manifest disregard.

*Westerbeke Corp. v. Daihatsu Motor Co., Ltd.*, 304 F.3d 200, 208–209 (2nd Cir.2002)

(citations omitted; internal quotations omitted). With respect to the meaning of "manifest disregard," the Second Circuit added that

> [t]he two-prong test for ascertaining whether an arbitrator has manifestly disregarded the law has both an objective and a subjective component. We first consider whether the governing law alleged to have been ignored by the arbitrators was well defined, explicit, and clearly applicable. . . . We then look to the knowledge actually possessed by the arbitrator. The arbitrator must appreciate the existence of a clearly governing legal principle but decide to ignore or pay no attention to it. . . . Both of these prongs must be met before a court may find that there has been a manifest disregard of law.

*Id.* at 209 (citations omitted; internal quotations omitted). "As long as the arbitrator is even arguably construing or applying the [relevant legal principles] and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision." *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 36, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987); *Local 1199, Drug, Hosp., and Health Care Employees Union, RWDSU, AFL–CIO v. Brooks Drug Co.*, 956 F.2d 22, 25 (2nd Cir.1992). A reviewing court " 'is forbidden to substitute its own interpretation even if convinced that the arbitrator's interpretation was not only wrong, but plainly wrong.' " *Brooks Drug Co.*, 956 F.2d at 25 (quoting *Chicago Typographical Union No. 16 v. Chicago Sun–Times, Inc.*, 935 F.2d 1501, 1505 (7th Cir.1991)).

### 2. Cable Convention

■ Tyco first argues that there is no U.S. case law that interprets the Cable Convention to allow a civil cause of action and the recovery of restoration costs. The relevant inquiry for this Court, in light of the deference to be accorded arbitration proceedings, is not whether any case law interprets the Cable Convention to authorize such an action and recovery but, rather, whether there is any "well defined, explicit, and clearly applicable" doctrine that prevents it.

Tyco relies on *Am. Tel. & Tel. Co. v. M/V Cape Fear*, 967 F.2d 864 (3rd Cir. 1992) to argue that the Third Circuit has explicitly precluded private causes of action under the Cable Convention. In fact, the *M/V Cape Fear* decision does not concern the Cable Convention. The issue there was the availability of an implied private cause of action under the Submarine Cable Act of 1888 (the "Cable Act"), 47 U.S.C. §§ 21–39. While the Cable Act incorporates many of the principles embodied in the Cable Convention, the Cable Act is an independent source of law. Additionally, according to the Third Circuit, the Cable Act does not imply a private cause of action because its language does not explicitly provide for one, nor does it "unambiguously describe[ ] the particular class upon which it intended to confer such a right." *M/V Cape Fear*, 967 F.2d at 867, 870 (citing *Cort v. Ash*, 422 U.S. 66, 78, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975)). The Third Circuit also observed that the Cable Act "is primarily criminal in nature." *Id.* at 867. Furthermore, the Third Circuit explained that

> the Cable Act recognizes the possibility that an aggrieved cable owner may want to obtain civil redress from one who has violated the statute's criminal prohibitions. However, it neither endorses nor discourages civil suits. Instead, it simply establishes that the Cable Act's criminal regime does not bar injured plaintiffs from bringing civil damage actions.

*Id.* at 868. Thus, even to the extent that the *M/V Cape Fear* decision, addressing

the Cable Act, might inform interpretations of the Cable Convention in certain circumstances, the holding itself does not foreclose the availability of civil damages for injury to a submarine cable.

For these reasons, *M/V Cape Fear* cannot reasonably be viewed as a "well defined, explicit, and clearly applicable" prohibition to a private cause of action under the Cable Convention or, more accurately on the facts of this case, does not preclude the sorts of damages cognizable under such a theory. Accordingly, Tyco's challenge to the Panel's award as being inconsistent with the Cable Convention fails to satisfy the first of the two-prong requirement for establishing manifest disregard and must be rejected.

### 3. Common Ownership of Damaged and Substitute Cables

■ Next, Tyco relies on *Brooklyn E. Dist. Terminal* to argue that the Panel improperly awarded restitution costs to the Cable Owners for the rerouting of TAT–10 traffic over the TAT–12/13 cable because of a certain degree of common ownership. In that case, the Supreme Court held that where a tugboat was damaged and rendered temporarily inoperable, the vessel's owner could not recover the market value of hiring a replacement tug when the workload of the damaged boat was redistributed between two boats that were owned by that same owner. 287 U.S. at 172–73, 53 S.Ct. 103. Accordingly, Tyco argues that because some of the companies participating in the TAT–10 consortium also were participating in the TAT–12/13 consortium, Tyco cannot be billed for restoring the TAT–10 traffic by rerouting it across the TAT–12/13 system given this common ownership.

The Panel considered Tyco's argument regarding the import of *Brooklyn E. Dist. Terminal* and rejected it. It explained:

The [P]anel considers the circumstances of this case to be clearly distinguishable from *Brooklyn Eastern District Terminal* with respect to the common ownership argument. A review of the consortium ownership of TAT–10 and TAT–12/13 indicates some overlapping owning companies, however, there are a number of companies participating in the TAT–10 consortium who are not participants in the TAT–12/13 consortium and vice versa. Whereas the TAT–10 consortium consists of 30 companies, the TAT–12/13 consortium is composed of 81 companies. Furthermore, the evidence establishes that the restoration agreement between TAT–10 and TAT–12/13 was handled at arms length .... In fact, wet restoration charges were recorded in book entries and settled by the exchange of money transfers.

(Panel Decision at 14.) The Court recognizes the factual distinction the Panel draws as a reasonable basis to distinguish *Brooklyn E. Dist. Terminal* from the present case and, consequently, does not regard that holding as "well defined, explicit, and clearly applicable" precedent. Accordingly, Tyco's argument fails the first prong of the required showing for manifest disregard, and its claim must therefore be rejected.

### 4. Annual Restoration Plans as a Component of Damages

■ Tyco argues that the Cable Owners were not entitled to recover costs incurred for annual restoration costs, prorated for the period during which TAT–10 traffic had to be rerouted, because these costs, Tyco argues, were not proximately caused by its actions and, instead, were prepaid contingency provisions in case of emergencies. The parties spend considerable time addressing this issue as one of proximate causation; however, the Panel approached the issue of compensation for annual resto-

ration costs as one of damage calculations, as it was undisputed that Tyco's actions caused the harm at issue.[2] In the process, Tyco appears to have understood the element of causation of the harm as foregone, and indeed it was. (*See, e.g.,* Affidavit of Ellen Brain dated March 9, 2002, Ex. A ("[I]t appears that the damage was caused by our plowing operations associated with the installation of another cable system. We regret the damage caused to TAT 10 ....."); Burnett Aff., Ex. 1C ("TYCO admits liability for causing a break in TAT–10 on July 31, 1998 but reserves its right to contest damages.").) Accordingly, Tyco's claim, while presented as a challenge to the proximate causation element of a putative negligence claim, in actuality speaks to the damages element, namely, to the valuation determined by the Panel insofar as this valuation incorporated prorated annual restoration costs as an aspect of the Cable Owners' loss of use of the TAT–10. Indeed, it was the valuation of the harm to the TAT–10 that was the focus and purpose of the arbitration. This Court does not find the Panel's understanding to be in contravention of "well defined, explicit, and clearly applicable" legal doctrine.

For example, in *Brooklyn E. Dist. Terminal,* the Supreme Court precluded recovery of the market value for tugboat services to cover the workload of the damaged and out-of-commission vessel when the substitution services were provided by the very party whose boat was damaged, using his other boats, because such a recovery would charge the tortfeasor for expenses that, in that situation, were never actually incurred. *See Brooklyn E. Dist. Terminal,* 287 U.S. at 173, 177, 53 S.Ct. 103 (district court's award based on market value was improper because it was "measured by expenses that in fact never were incurred, but that might have been incurred and charged to the respondent if the necessities of the business had been something other than they were."). In addition, however, the Supreme Court explained that in cases where a boat owner maintained a spare boat in the event of an emergency, while the replacement services rendered by his own spare boat could not be assessed at a full market rate that was never actually charged, the boat owner's recovery for expenses relating to his damaged boat and the attendant substitution services could include some consideration of the costs of maintaining and operating the spare boat. *See id.* at 175, 177, 53 S.Ct. 103 ("The vessel may have been employed in a business of such a nature that for the avoidance of loss there is need of the employment of a substitute. In such circumstances the fair value of the hire may be an element of damage, and this whether the substitute is actually procured or not.") Furthermore, the timing of the

---

**2.** As will be set forth with greater specificity in the ensuing discussion of applicable case law, it is worth noting generally at this point that the Restatement (Second) of Torts §§ 430, 928, and 931 (1979) support the Panel's approach of construing responsibility for a claimed harm as a component of causation, and construing the measure of the value of that harm as a component of damages apart from causation.

Section 430 provides: "In order that a negligent actor shall be liable for another's harm, it is necessary not only that the actor's conduct be negligent toward the other, but

also that the negligence of the actor be a legal cause of the other's harm."

Section 928 provides in relevant part: "When one is entitled to a judgment for harm to chattles not amounting to a total destruction in value, the damages include compensation for ... the loss of use."

Section 931 provides in relevant part: "If one is entitled to a judgment for the detention of, or for preventing the use of, land or chattels, the damages include compensation for ... the value of the use during the period of detention or prevention or the value of the use of or the amount paid for a substitute ...."

contingency measure was not determinative in the Supreme Court's analysis. *Id.* at 176–77, 53 S.Ct. 103 ("If no [spare] boat had been maintained, another might have been hired, and the hire charged as an expense. The result is all one whether the substitute is acquired before the event or after.").

Subsequent cases in this Circuit have clarified the matter. In *Sinclair Refining Co. v. The America Sun*, 188 F.2d 64 (2nd Cir.1951), a ship owner whose cargo vessel was damaged sought to recover the market rate of a replacement hire vessel for the period during which its own ship was inoperable. The Second Circuit affirmed the district court's refusal to allow this measure of damages for loss of use because no such substitute vessel was indeed hired. However, the district court also precluded evidence as to what contingency measures the ship owner did take to arrange for the transportation of his cargo during the period in question, and the Second Circuit reversed, holding that such costs are properly considered in determining damages. Citing *Brooklyn E. Dist. Terminal*, the Second Circuit noted: "Whatever the method employed, it should be one that is reasonably adapted to the circumstances of each case so that there will, on the one hand, be no failure to award damages suffered and, on the other, no unreasonable award based upon some theoretical concept of loss." *Id.* at 66 (citing *Brooklyn E. Dist. Terminal*, 287 U.S. at 170, 53 S.Ct. 103); *see United States v. Panama Transp. Co.*, 174 F.Supp. 592, 594 (S.D.N.Y.1959) ("There is no doubt that [the ship owner], as owner of the [damaged vessel], was entitled to damages because of the detention of the ship as a result of the collision. . . . Such damages may be measured by the loss of charter hire during the detention period." (citing *Brooklyn E. Dist. Terminal*, 287 U.S. at 170, 53 S.Ct. 103, and *The Yaye Maru*, 274 F. 195, 200 (4th Cir.1921))).

This Court finds the facts of *Sinclair Refining Co.* analogous to those involved in the matter at hand. The holding in that case supports the Panel's determination that the Cable Owners' expenses incurred in rerouting the TAT–10 traffic over other systems while the damaged cable was being repaired are recoverable—so long as, in light of *Brooklyn E. Dist. Terminal*, those expenses were actually incurred and regardless of whether some or all of the rerouting arrangements occurred before or after the accident. The Panel's decision to include annual restoration costs, prorated to the number of days the TAT–10 was out of service as a result of Tyco's actions, is therefore not in violation of "well defined, explicit, and clearly applicable" law, and Tyco's challenge on this basis must be rejected.

### B. DISCOVERY–RELATED DISCLOSURES AND THE FACTUAL BASES FOR THE AWARD

#### 1. Standard of Review

■ It bears repeating here the Second Circuit's admonition that "[t]he showing required to avoid summary confirmation of an arbitration award is high . . . ." *Willemijn Houdstermaatschappij, BV*, 103 F.3d at 12; *see Amicizia Societa Navegazione v. Chilean Nitrate & Iodine Sales Corp.*, 274 F.2d 805, 808 (2nd Cir.1960). "[A]rbitration awards are subject to very limited review in order to avoid undermining the twin goals of arbitration, namely, settling disputes efficiently and avoiding long and expensive litigation." *Willemijn Houdstermaatschappij, BV*, 103 F.3d at 12; *Folkways Music Publishers v. Weiss*, 989 F.2d 108, 111 (2nd Cir.1993).

■ Section 10(a)(3) of the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*, provides in relevant part that the Court may vacate an arbitration award "where the arbitrators were guilty of misconduct . . .

in refusing to hear evidence pertinent and material to the controversy." 9 U.S.C. § 10(a)(3). Therefore, "if the arbitrator refuses to hear pertinent and material evidence to the prejudice of one of the parties, the arbitration award may be set aside.... However, the misconduct must amount to a denial of fundamental fairness of the arbitration proceeding to warrant vacating the award." *Areca, Inc. v. Oppenheimer & Co., Inc.,* 960 F.Supp. 52, 55 (S.D.N.Y.1997) (citations omitted; internal quotations omitted); *see Textron, Inc. v. Local 516, UAW,* 500 F.2d 921, 923 (2nd Cir.1988); *see also Halligan v. Piper Jaffray, Inc.,* 148 F.3d 197, 204 (2nd Cir.1998). It is well settled that arbitrators enjoy "broad discretion to determine whether to hear evidence," *Areca, Inc.,* 960 F.Supp. at 55; *see Trade Transp., Inc. v. Natural Petroleum Charterers Inc.,* 738 F.Supp. 789, 792 (S.D.N.Y.1990), *aff'd,* 931 F.2d 191 (2nd Cir.1992), and that the arbitration process may proceed

> with only a summary hearing and with restricted inquiry into factual issues.... Although arbitrators must have before them enough evidence to make an informed decision, they need not compromise the speed and efficiency that are the goals of arbitration by allowing the parties to present every piece of relevant evidence.

*Areca, Inc.,* 960 F.Supp. at 55 (citations omitted; internal quotations omitted).

### 2. Adequacy of Discovery

■ Tyco claims that the Panel improperly truncated discovery and failed to consider evidence relevant to the dispute, and argues for vacatur on this basis pursuant to 9 U.S.C. § 10(a)(3). The challenges Tyco raises to the Panel's decisions regarding discovery and related disclosures fall short of establishing any denial of fundamental fairness. Indeed, the ensuing portions of this Decision and Amended Order addressing Tyco's substantive challenges to the specific portions of the arbitration award indicate that the Panel's conclusions are adequately supported by the evidence. In addition, the Court notes that discovery disclosures and the administrative process underlying the Panel Decision were actually fairly extensive. During seven hearings conducted over the course of a year, the Cable Owners disclosed over 1,000 pages of documents culminating in some 80 exhibits submitted to the Panel. The Panel heard testimony from at least four live witnesses and considered the affidavits with attachments from at least five other witnesses. The Court has reviewed these exhibits, affidavits, attachments, and hearing transcripts and is unpersuaded by Tyco's contentions that the arbitration proceedings were fundamentally unfair or that the Panel did not have before it sufficient evidence to render an informed decision.

### 3. "Wet" Restoration Over TAT–12/13

■ Tyco contests the Panel's award of $2 million in compensation for the redirection of traffic from the damaged TAT–10 across the TAT–12/13 cable system. Tyco points to the fact that a version of the TAT–12/13 Restoration Central Billing Party Annual Report—Year Ending 31 May 1998 & Supplemental Report—For Period Ending 30th September 1998 (the "TAT–12/13 1998 Annual Report") indicating that no restoration charges were billed to the TAT–10 consortium pursuant to the July 31, 1998 incident. (Yudes Aff., Ex. 25 at 5.) According to AT & T, this initial report reflects a misunderstanding by the billing officials at BT, serving as the Central Billing Party for the TAT–12/13 consortium, who were under the impression, at the time this report was generated, that a previous restoration plan between TAT–10 and TAT–12/13 was still in effect at the time when TAT–10 traffic was redirected through the TAT–12/13. Pursuant to this prior plan, these two consortia agreed to

supply one another with emergency access to their respective cable lines at no charge. Relying on an exchange of letters between the chairmen of these two consortia, the Panel concluded that the TAT–12/13 chairman did not agree to extend this mutual restoration agreement and that this agreement therefore expired on May 12, 1998. (Burnett Aff., Ex. 25.) The Panel found that once this change in relationship was brought to the attention of the billing officials at BT, a revised TAT–12/13 1998 Annual Report was generated that reflected the charges. (Yudes Aff., Ex. 24.)

Tyco challenges the reliability of this report and the underlying claim that TAT–12/13 actually charged TAT–10 for the redirected traffic because this revised report was generated after arbitration had commenced. The Panel rejected this claim, and its credibility analysis was based in large part on the exchange of letters mentioned above between the consortia chairmen. The Court recognizes this as a reasonable basis for resolving the dispute over whether TAT–10 was actually billed and has been presented with no convincing grounds to revisit the Panel's credibility determination. For these reasons, Tyco's challenge to this portion of the arbitration award is rejected.

### 4. Backhaul Restoration (Ad Hoc and Annual Totaled)

▇▇▇ Tyco challenges the portion of the Panel Decision awarding the Cable Owners fees for ad hoc backhaul restoration, the portion of redirected TAT–10 cable traffic that exceeds the annual allotment of emergency bandwidth coverage agreed upon in the various restoration plans with other systems. Specifically, Tyco contends that there was no evidence establishing that TAT–10 paid the fees incurred for the portion of traffic rerouted over AT & T's system, DTAG's system, or CW's system. Tyco further claims that it was not afforded adequate discovery regarding the docu-

ments related to the fees incurred for the portion of TAT–10 traffic rerouted over BT's system.

The Panel heard detailed direct and cross examination testimony in person from John Dubose ("Dubose"). Dubose was employed by AT & T from June 1984 through June 2000 and served as AT & T's operations manager for the restoration and networking administration of all Atlantic cable systems during the restoration period in question. (Burnett Aff., Ex. 4.) The Panel also received an Affidavit of Ronald S. Fields ("Fields") dated July 2001. Fields began working for AT & T in 1985 and, in 1996, was charged with handling restoration billing for AT & T. His affidavit was accompanied by numerous documents, including billing records and invoices for restoration services in 1998, grouped into three exhibits that reflect charges to TAT–10 for ad hoc restoration over AT & T's system. (Burnett Aff., Ex. 7; see also Yudes Aff., Ex. 31.)

Upon reviewing this evidence and testimony, the Panel concluded that TAT–10 was fairly and properly billed $15,000 per 45 megabit block of bandwidth, that TAT–10 paid these costs, and that reimbursement by Tyco in the amount of $634,096.43, including a prorated fixed annual charge of $214,096.43, was appropriate. (Panel Decision at 16–17.) Similarly, the Panel considered evidence, including the Affidavit of Guenter Geiling dated June 15, 2001, along with supporting invoices, tariff rates, and billing summaries, (Burnett Aff., Ex. 2; Yudes Aff., Ex. 32), and concluded that TAT–10 was charged $151,620, including a prorated annual restoration tariff rate, for the rerouting of its traffic over DTAG's system and, accordingly, included this sum in its computation of damages owed to the Cable Owners, (Panel Decision at 16). The Court has reviewed the evidence underlying the Pan-

el's conclusions on these issues and concludes that Tyco has not met its heavy burden of showing that the Panel's underlying rationale was in manifest disregard of the evidence or represents a denial of fundamental fairness.

The same conclusion follows regarding the portion of the Panel's award reflecting the costs incurred for the rerouting of TAT–10 traffic over CW's system, which, in accordance with the prorated annual restoration tariff rate, totaled $74,809. (Panel Decision at 16.) In concluding that the Cable Owners were entitled to repayment of this sum, the Panel relied on evidence that included live testimony by Simon King ("King"), a network restoration manager with BT, (Yudes Aff., Ex. 10 at 483–85); the TAT–10 Segment B Facility Restoration Plan for May 1998—May 1999, which provides for restoration over CW's system and delineates applicable bandwidth rates, (Burnett Aff., Ex. 10); and various invoices and billing summaries (Yudes Aff., Ex. 29). In light of this evidence, the Court concludes that Tyco has not met its burden of demonstrating that the Panel's decision was in manifest disregard of the evidence or represents a denial of fundamental fairness.

Tyco's challenge to the portion of the Panel Decision for backhaul restoration over BT's network, which, including the prorated annual restoration tariff rate, totaled $1,207,235.38, concerns its access to supporting documents for purposes of authentication and cross examination at the hearing. (Memorandum Of Law In Opposition To Petition For An Order Confirming An Award Of The Arbitration Panel And In Support Of Cross–Motion To Vacate Arbitration Award dated October 2, 2002 ("Tyco Br.") at 9–10.) The discovery aspect of Tyco's argument is covered by this Court's discussion appearing in Section II.B.2 *supra*. Regarding the sufficiency of the evidence underlying the

Panel's award, the supporting documents include numerous invoices and billing records memorializing BT's backhaul restoration services and charges through 1999, (Yudes Aff., Ex. 28; *see also* Burnett Aff., Ex. 10, 11, 15), many of which were submitted as part of the Affidavit of Peter Byers ("Byers") dated July 24, 2001, (Yudes Aff., Ex. 27). Byers worked for BT since 1965, and from September 1995 through February 2001 he handled backhaul and undersea cable restoration, billing, and accounting. The Panel also heard detailed direct and cross examination testimony in person from King, the international network restoration manager with BT since 1998 and a BT employee since 1978, on the authenticity of these documents and the process by which BT bills for restoration services. (Yudes Aff., Ex. 4, 5.)

Upon consideration of the record before it, the Panel concluded that both the annual and ad hoc charges assessed against TAT–10 were correctly calculated, billed, and paid. (Panel Decision at 16–17.) The Court has reviewed the evidence underlying the Panel's conclusions regarding BT's backhaul restoration services and charges and concludes that Tyco has not shown that these conclusions were reached in manifest disregard of the evidence, which the Court finds was adequate to permit an informed decision, or that they represent a denial of fundamental fairness.

## C. *SMA RULES AND ATTORNEYS' FEES*

█ Tyco argues that the Panel improperly concluded that the parties implicitly agreed to be governed by the Rules of the Society of Maritime Arbitrators (the "SMA Rules"). The Court reviews this challenge in accordance with the standard of deference applicable to arbitrators' decisions concerning evidentiary matters, dis-

covery procedures, and factual findings as outlined above. The Court concludes that the Panel's decision to apply the SMA Rules is supported by a proper basis in fact.

Tyco points to the fact that it had rejected a formal agreement embodying various procedural stipulations, one of which was an explicit provision that the SMA Rules would govern the proceedings, as conclusive evidence that Tyco never intended to be bound by these rules. AT & T argues, however, that there were many other issues contained in this proposed agreement, including discovery disclosure provisions and deadlines, and that, therefore, the mere inclusion of an SMA Rules proposal as one of various provisions means Tyco's rejection of the proposed agreement cannot be viewed as conclusive evidence of Tyco's rejection of these rules in particular. Indeed, Tyco itself explains that it rejected the proposed agreement "for various reasons." (Tyco Br. at 24.) Furthermore, this proposed agreement was offered as a modification of a prior Agreement dated August 10, 1998 between AT & T and Tyco (the "August 10 Agreement") which specified that either the SMA Rules or those of the American Arbitration Association (the "AAA Rules") would govern the arbitration. (Burnett Aff., Ex. 1C.) Additionally, the Panel explained that

> there was correspondence between the parties mentioning SMA Rules. There were also numerous written exchanges between counsel regarding the application of specific points covered by SMA Rules. For example, counsel have argued about the timetable for submitting documentary evidence in advance of scheduled hearings and whether the arbitrators were empowered to render a partial award on a discrete point. Neither counsel suggested at anytime during these exchanges, either before or after our rulings, that SMA Rules were

inapplicable and should be disregarded because they were never agreed to. In fact, the [P]anel's rulings on these points turned upon our understanding and interpretation of SMA Rules and counsel's apparent reliance on them.

(Panel Decision at 4.) This excerpt references an instance in which Tyco itself argued against a partial final award at the first arbitration hearing by specifically invoking the SMA Rules, (Yudes Aff., Ex. 22 (Tyco argued that "there is no basis for entering a partial final award under SMA Rule 31" because only one and not both parties requested it)), and the Panel accepted this argument and declined the Cable Owners' request for a partial final award on this basis, (Burnett Aff., Ex. 24).

For the reasons discussed above, the Court cannot conclude that the Panel's decision to apply the SMA Rules is so lacking a basis in the record as to deprive Tyco of fundamental fairness. Tyco contests the applicability of the SMA Rules as opposed to the AAA Rules because the former permit attorneys' fees and costs as a component of the award while the latter do not. Having upheld the Panel's decision to be guided by the SMA Rules, it follows that the Panel's award of attorneys' fees and costs is also sufficiently supported by the factual record, as Tyco makes no independent argument to challenge either the award of attorneys' fees and costs or their computation.

## D. ARBITRATORS' FEE

■ In Appendix A to the Final Award, the Panel delineated its fee for the arbitration services it provided the parties, which totaled $136,000, and allocated 75 percent to be paid by Tyco and 25 percent to be paid by the Cable Owners within 30 days of the date the Final Award was issued, September 12, 2002. On December 12, 2002, the Panel issued a statement

indicating that Tyco had not paid its share. Because the parties are jointly and severally responsible for paying the fee, AT & T paid the portion allocated by the Panel to Tyco on January 3, 2003. AT & T brought this development to the Court's attention in a letter to the Court dated January 3, 2003 from Douglas Burnett, and Tyco responded in a letter to the Court dated January 10, 2003 from Alfred Yudes that paying the arbitrators' fee as assessed would not be consistent, in Tyco's view, with the pendency of the present action before this Court. At any rate, no challenge to the amount of the arbitrators' fee or its allocation between the parties has been made. Therefore, in accordance with the Panel's assessment in Appendix A to the Final Award, AT & T is entitled to be reimbursed for Tyco's share of the arbitrators' fee, amounting to $102,000, plus interest of 4.5 percent to accrue on this principal amount as of 30 days from the date of the Final Award.

## III. CONCLUSION AND AMENDED ORDER

For the reasons discussed above, it is hereby

**ORDERED** that the Court's Order dated March 31, 2003 is amended to incorporate the discussion set forth above; and it is further

**ORDERED** the arbitrators' Final Award dated September 12, 2002 is confirmed in its entirety; and it is further

**ORDERED** that AT & T is entitled to recover from Tyco, in accordance with the Final Award dated September 12, 2002, the sum of $5,798,075.83 plus interest at a rate of 4.75 percent accruing on the principal amount of $4,373,101.18 after October 15, 2002, the date by which payment was due; and it is further

**ORDERED** that AT & T is further entitled to recover from Tyco, in accordance with Appendix A to the Final Award

dated September 12, 2002, the sum of $102,000 plus interest at a rate of 4.75 percent accruing on this amount after October 15, 2002, the date by which such payment was due; and it is finally

**ORDERED** that AT & T is entitled to judgment against Tyco in the amounts delineated above.

The Clerk of Court is directed to close this case.

**SO ORDERED.**