**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

| | |
|---|---|
| STATE OF WASHINGTON, | No. 85360-1-I |
| Respondent, | DIVISION ONE |
| v. | UNPUBLISHED OPINION |
| AMERICAN TOBACCO CO., | |
| Defendant, | |
| COMMONWEALTH BRANDS INC.; COMPANIA INDUSTRIAL de TABACOS MONTE PAZ, SA; DAUGHTERS & RYAN, INC.; FARMERS TOBACCO CO.; HOUSE OF PRINCE A/S; ITG BRANDS, LLC, JAPAN TOBACCO INTERNATIONAL USA, INC.; KING MAKER MARKETING INC.; KRETEK INTERNATIONAL; LIGGETT GROUP LLC; P.T. DJARUM; PETER STOKKEBYE TOBAKSFABRIK A/S; PHILIP MORRIS USA, INC.; R.J. REYNOLDS TOBACCO COMPANY; REEMTSMA CIGARETTENFABRIKEN GMBH; SANTA FE NATURAL TOBACCO COMPANY; SCANDINAVIAN TOBACCO GROUP LANE LIMITED; SHERMAN'S 1400 BROADWAY NYC, LLC; TOP TOBACCO, LP; VON EICKEN GROUP; and WIND RIVER TOBACCO CO. LLC, | |
| Appellants. | |

MANN, J. — In the 1990s, several states, including Washington, sued major cigarette manufacturers, seeking to protect the public health and gain compensation for costs incurred from treating smoking-related illnesses. The participating manufacturers (PMs) and the states settled their dispute in the late 1990s and entered into a Master Settlement Agreement (MSA), which requires the PMs to make annual cash payments to the states in perpetuity.

In 2022, the PMs moved in King County Superior Court to vacate a reallocation order issued by the 2004 arbitration panel (2004 Panel). The trial court concluded that none of the applicable statutory grounds for vacating the order exist and denied the motion. The PMs appeal the trial court's decision. We affirm.

I

In 1998, 46 states, the District of Columbia, and 5 United States territories (collectively, the Settling States or States) settled a lawsuit against 4 major cigarette manufacturers resulting in the MSA. State v. Am. Tobacco Co., 28 Wn. App. 2d 452, 459, 537 P.3d 303 (2023) (Tobacco I).[1] The MSA is a landmark public health agreement. State v. R.J. Reynolds Tobacco Co., 151 Wn. App. 775, 778, 211 P.3d 448 (2009).

Over 50 tobacco manufacturers, the PMs, have agreed to be bound by the terms of the MSA. Tobacco I, 28 Wn. App. 2d at 459. Manufacturers that have not joined the MSA are known as "Non-Participating Manufacturers" (NPMs).

---

[1] This court issued an unpublished opinion on a different dispute arising out of the MSA on the same day: State v. American Tobacco Co., No. 84691-4-I (Wash. Ct. App. Oct. 16, 2023) (unpublished), https://www.courts.wa.gov/opinions/pdf/846914.pdf. Accordingly, this opinion refers to the published opinion as Tobacco I. More detailed background facts can be found in Tobacco I.

The MSA requires the PMs make annual cash payments to the States in perpetuity to offset increased costs to the States' healthcare systems caused by smoking. Tobacco I, 28 Wn. App. 2d at 459. The annual payments are subject to possible adjustments, including the adjustment at issue: the NPM Adjustment. The NPM Adjustment applies when the PMs experience a market share loss to the NPMs in a given year. MSA § IX(d)(1); Tobacco I, 28 Wn. App. 2d at 460.

The NPM Adjustment applies "to the Allocated Payments of <u>all</u> Settling States." MSA § IX(d)(2)(A) (emphasis added). But a state can avoid a reduction in its annual payment if it demonstrates that it "had a Qualifying Statute . . . in full force and effect during the entire calendar year immediately preceding the year in which the payment in question is due, and diligently enforced the provisions of such statute during such entire calendar year." MSA § IX(d)(2)(B)(i).

If a state does not adopt or does not diligently enforce a Qualifying Statute,[2] its Allocated Payment is subject to reduction:

> The aggregate amount of the NPM Adjustments that would have applied to the Allocated Payments of those Settling States that are not subject to an NPM Adjustment pursuant to subsection (2)(B) shall be reallocated among all other Settling States pro rata in proportion to their respective Allocable Shares . . . and such other Settling States' Allocated Payments shall be further reduced accordingly.

MSA § IX(d)(2)(C).

During arbitration over the 2003 NPM Adjustment, the PMs reached a partial settlement, the "Term Sheet Settlement," with some states, these states are known as the "Resolved States." Because of this, a panel of three retired federal judges (2003

---

[2] Washington's qualifying statute was enacted in 1999, codified as chapter 70.157 RCW.

Panel) considered how to treat the Resolved States in the NPM Adjustment. The 2003 Panel determined that the Independent Auditor should treat the Resolved States as diligent and not subject to the 2003 NPM Adjustment, but reduced the Adjustment by a percentage equal to the aggregate Allocable Shares of the Resolved States.[3] Pursuant to this pro rata judgment reduction, the Resolved States' shares of the Adjustment, as reduced, would be reallocated among the non-diligent states. Each of the states found non-diligent moved to vacate that ruling in their respective state courts and prevailed.[4]

Eight states joined the 2004 NPM Adjustment Arbitration; by that time, the number of Resolved States had risen to thirty-seven. In the case management order for the arbitration, the Arbitrating States agreed they would have the burden to prove their diligence. The "overarching question" for the 2004 Panels to consider was whether the Arbitrating States "diligently enforced" their Qualifying Statutes in 2004.

In a 2017 interim order, the Panel "deem[ed] it appropriate to establish a procedure" for the reallocation of the 2004 NPM Adjustment (2017 Reallocation Order). The Panel decided it would presume that the Resolved States were non-diligent for 2004. The Panel also created a new procedure through which the PMs would be allowed to contest and rebut that presumption as to any or all Resolved States. Maryland, one of the Arbitrating States, sought reconsideration of that order, which was

---

[3] Each PM makes a single nationwide payment into an escrow account in the overall amount calculated and determined by the Independent Auditor. Since 1998, PricewaterhouseCoopers LLP has been the Independent Auditor. The Independent Auditor then allocates the nationwide payments among the States according to each State's Allocable Share.

[4] Two of the six states settled their disputes and became Resolved States. The cases from the four remaining states, Pennsylvania, Missouri, Maryland, and New Mexico, are discussed later in this opinion.

stayed until after state-specific diligence determinations could be made. Six states were found diligent. Washington and Missouri, however, were found non-diligent.[5]

Following briefing from the parties and oral argument, the Panel granted the Arbitrating States' motion to vacate the 2017 Reallocation Order (2022 Reallocation Order). The Panel explained:

> The Members of the 2004 NPM Adjustment Panels conclude that in attempting in our May 2017 Reallocation Order to craft a reasonable alternative procedure to address the treatment of Resolved States with regard to calculating reallocation, we endeavored to make more efficient a process for which we lacked authority in the first place. As held by each of the MSA Courts to consider the issue, the fact that the MSA is silent on the treatment of States that negotiate a settlement for purposes of calculating reallocation of the NPM Adjustment does not create an ambiguity in the MSA which allows the Panels to impose a procedure they think reasonable.
>
> The MSA unambiguously sets forth the procedure by which a State may seek relief from the NPM Adjustment by showing its diligence in enforcing its Qualifying Statute. MSA Sec. IX(d)(2). The MSA says nothing about Resolved States, nor does it provide for allowing the PMs to assert a diligence claim on behalf of a Resolved State, or to contest and rebut a presumption that a Resolved State is non-diligent to exclude them from the NPM Adjustment.

The Panel concluded that the Resolved States "must be deemed to be subject to the 2004 NPM Adjustment for purposes of calculating reallocation." Further, the procedure allowing the "PMs to contest and rebut a presumption of non-diligence on behalf of Resolved States as set forth in the May 2017 Reallocation Order constituted an unauthorized amendment of the MSA."

The PMs moved to vacate the 2022 Reallocation Order. The trial court denied the PMs' motion to vacate concluding that no applicable statutory grounds for vacating

---

[5] New Mexico was also found non-diligent but a court later vacated that determination.

the order exist. The trial court specifically ruled that "[t]he Panel did not fail to consider material evidence because it interpreted the contract not to allow anyone other than a state to prove a diligence claim." And, "[t]he Panel did not exceed its authority because the Panel had the authority to interpret the MSA and it did so."

The PMs appeal.

II

A

The parties disagree whether the Federal Arbitration Act (FAA), 9 U.S.C. § 10, or the Washington uniform arbitration act (WUAA), chapter 7.04A RCW, applies here. The PMs concede, however, that any differences between Washington law and federal law are immaterial.[6] We agree.

First, under the FAA, vacatur is permitted only "where the arbitrators were guilty of misconduct . . . in refusing to hear evidence pertinent and material to the controversy" or "where the arbitrators exceeded their powers." 9 U.S.C. § 10(a)(3), (4). Similarly, under the WUAA, the court shall vacate an award if an arbitrator "refused to consider evidence material to the controversy" or "exceeded the arbitrator's powers." RCW 7.04A.230(1)(c), (d).

This court recently reiterated the limits of our review of an arbitration decision:

> Under Washington law, "[c]ourts will review an arbitration decision only in certain limited circumstances, such as when an arbitrator has exceeded [their] legal authority." Int'l Union of Operating Eng'rs v. Port of Seattle, 176 Wn.2d 712, 720, 295 P.3d 736 (2013). "To do otherwise would call

---

[6] The MSA provides, "[t]he arbitration shall be governed by the United States Federal Arbitration Act." MSA § XI(c). However, the MSA also contains choice of law provisions, the MSA "shall be governed by the laws of the relevant Settling State, without regard to the conflict of law rules of such Settling State." MSA § XVIII(n). In addition, MSA §§ II(p) and VII(a) provide it is "the respective court in each Settling State" that has "exclusive jurisdiction" over disputes arising out of the MSA.

into question the finality of arbitration decisions and undermine alternative dispute resolution." Int'l Union of Operating Eng'rs, 176 Wn.2d at 720. Our review of an arbitrator's award is "limited to the same standard applicable in the court which confirmed, vacated, modified, or corrected that award." Salewski v. Pilchuck Veterinary Hosp., Inc., 189 Wn. App. 898, 903, 359 P.3d 884 (2015). We review only whether one of the statutory grounds to vacate an award exists. Salewski, 189 Wn. App. at 903-04. The party challenging the award bears the burden of showing such grounds exist. Cummings v. Budget Tank Removal & Env't Servs., LLC, 163 Wn. App. 379, 388, 260 P.3d 220 (2011).

Tobacco I, 28 Wn. App. 2d at 478.

Because the applicable provisions of the FAA and WUAA are so similar, we do

not reach the issue of which law applies.

B

The PMs assert that they are entitled to vacatur of the arbitration award because

the Panel exceeded its authority in issuing the 2022 Reallocation Order. We disagree.

Tobacco I recently discussed the narrow circumstances for vacatur on this

ground:

> In considering a motion to vacate on this ground, we examine whether there is an error of law "'on the face of the award'" that goes to the arbitrator's decision. Salewski, 189 Wn. App. at 904 (quoting Federated Servs. Ins. Co. v. Pers. Representative of [Est.] of Norberg, 101 Wn. App. 119, 123, 4 P.3d 844 (2000)). But "the facial legal error standard is a very narrow ground for vacating an arbitral award." Broom v. Morgan Stanley DW Inc., 169 Wn.2d 231, 239, 236 P.3d 182 (2010). "Limiting judicial review to the face of the award is a shorthand description for the policy that courts should accord substantial finality to arbitrator decisions." Est. of Norberg, 101 Wn. App. at 123. "'The error should be recognizable from the language of the award, as, for instance, where the arbitrator identifies a portion of the award as punitive damages in a jurisdiction that does not allow punitive damages.'" Salewski, 189 Wn. App. at 904 (quoting Cummings, 163 Wn. App. at 389). The example provided in Salewski was indeed more than an ordinary legal error, but one contrary to the long established public policy of Washington that "recovery of punitive damages is contrary to the public policy of the State and will not be allowed unless expressly authorized by statute." Kennewick Educ. Ass'n

-7-

> v. Kennewick Sch. Dist. No. 17, 35 Wn. App. 280, 282, 666 P.2d 928 (1983) (citing Spokane Truck & Dray Co. v. Hoefer, 2 Wash. 45, 25 P. 1072 (1891)). Barring a statutory basis for vacating an arbitration award, the general rule is that "[a]rbitrators, when acting under the broad authority granted them by both the agreement of the parties and the statutes, become the judges of both the law and the facts." N. State Constr. Co. v. Banchero, 63 Wn.2d 245, 249, 386 P.2d 625 (1963).

28 Wn. App. 2d at 478-79.

Under the FAA, in determining whether arbitrators "exceeded [their] powers," a court must examine whether the award draws its "essence from the contract." Oxford Health Plans LLC v. Sutter, 569 U.S. 564, 569, 133 S. Ct. 2064, 186 L. Ed. 2d 113 (2013). That is, a court must determine whether the award can be "rationally derived" from the agreement between the parties. Ario v. Underwriting Members of Syndicate 53 at Lloyds for 1998 Year of Account, 618 F.3d 277, 295 (3d Cir. 2010). "Because the parties 'bargained for the arbitrator's construction of their agreement,' an arbitral decision 'even arguably construing or applying the contract' must stand regardless of a court's view of its (de)merits." Oxford Health, 569 U.S. at 569 (quoting E. Associated Coal. Corp. v. Mine Workers, 531 U.S. 57, 62, 121 S. Ct. 462, 148 L. Ed. 2d 354 (2000)). To show the Panel exceeded its powers, the PMs must prove the Panel "act[ed] outside the scope of [its] contractually delegated authority" by issuing an award reflecting the Panel's "own notions of economic justice" rather than "drawing its essence from the contract." Oxford Health, 569 U.S. at 569.

The MSA's arbitration clause submits any dispute or claim "arising out of or relating to calculations performed by, or any determinations made by, the Independent Auditor," including the NPM Adjustment, to binding arbitration. MSA § XI(c). The

parties do not dispute that the Panel had the authority to interpret the applicable provisions in the MSA.

The PMs contend that prior court decisions, based on the 2003 NPM Adjustment, support their position that the 2022 Reallocation Order exceeds the bounds of the MSA. Four courts considered the 2003 Panel's Award: Maryland, Pennsylvania, Missouri, and New Mexico. State v. Philip Morris, Inc., 225 Md. App. 214, 123 A.3d 660 (Ct. Spec. App. 2015) (Maryland); Commonwealth v. Philip Morris USA, Inc., 114 A.3d 37 (Pa. Commw. Ct. 2015) (Pennsylvania); State ex rel. Greitens v. Am. Tobacco Co., 509 S.W.3d 726, 729 (Mo. 2017) (Missouri); Ord. Denying Pl.'s Mot. to Vacate Final Arb. Award & Granting Pl.'s Mot. to Vacate Partial Arb. Award, New Mexico ex rel. King v. Philip Morris, USA, No. D-101-cv-1997-01235 (Santa Fe 1st Judicial Dist. Ct. N.M. Sept. 27, 2016) (New Mexico I).

The 2003 Panel determined that the Independent Auditor should treat the Resolved States as diligent and not subject to the 2003 NPM Adjustment, but reduced the Adjustment by a percentage equal to the aggregate Allocable Shares of the Resolved States. All four courts concluded that the applicable MSA provisions unambiguously establish the conditions under which a State's NPM Adjustment allocation would shift—if the State diligently enforced its qualifying statute. Maryland, 225 Md. App. at 245-46; Pennsylvania, 114 A.3d at 62; Missouri, 509 S.W.3d at 738; New Mexico I, ord. at 7. All four courts also concluded the 2003 Panel exceeded its power because the adopted procedure, the pro rata reduction to the reallocation, constituted an amendment of the MSA without consent of all parties affected by it.

<u>Maryland</u>, 225 Md. App. at 247; <u>Pennsylvania</u>, 114 A.3d at 62; <u>Missouri</u>, 509 S.W.3d at 738-39; <u>New Mexico I</u>, ord. at 7.[7]

The PMs assert that the 2003 cases are indistinguishable from the case here because the 2004 Panel also exceeded its powers by treating the Resolved States as not diligent without a factual determination.

But the question before this court is limited to "whether the arbitrator (even arguably) interpreted the parties' contract, not whether [the arbitrator] got its meaning right or wrong." <u>Oxford Health</u>, 569 U.S. at 564. Or whether there is an error of law on the face of the award. <u>Salewski</u>, 189 Wn. App. at 904. Both tests "are intended to be narrow means of vacating an arbitration award." <u>Tobacco I</u>, 28 Wn. App. 2d at 480.

Here, the Panel did not exceed its power under either test. The Panel determined that the Resolved States "have not elected to invoke the option of challenging the application of the NPM Adjustment for 2004 by demonstrating that they diligently enforced the provisions of their Qualifying Statute under MSA Sec. IX(d)(2)(A) and (B)." Further, "the Resolved States must be deemed to be subject to the 2004 NPM Adjustment for purposes of calculating reallocation in accord with MSA Sec. IX(d)(1)."

Unlike the 2003 Panel, the 2004 Panel interpreted the MSA and determined that it unambiguously set forth the procedure by which a State may seek relief from the NPM adjustment. The 2004 Panel used the plain language of the MSA to make its

---

[7] The MSA can only be amended by agreement of all parties affected by the amendment and "[t]he terms of any such amendment shall not be enforceable in any Settling State that is not a signatory to such amendment." MSA § XVIII(j).

determination. And because the 2004 Panel had the authority to interpret the MSA, they did not exceed their powers.

The PMs also repeatedly assert that "the Panel fundamentally erred in holding that it 'lacked authority' to address the diligence of Resolved States." But the actual holding of the Panel was:

> [I]n attempting in our May 2017 Reallocation Order <u>to craft a reasonable alternative procedure</u> to address the treatment of Resolved States with regard to calculating reallocation, we endeavored to make more efficient <u>a process for which we lacked authority</u> in the first place. . . . the fact that the MSA is silent on the treatment of States that negotiate a settlement for purposes of calculating reallocation of the NPM Adjustment does not create an ambiguity in the MSA which allows the Panels to impose a procedure they think reasonable.
>
> <u>The MSA unambiguously sets forth the procedure by which a State may seek relief from the NPM Adjustment</u> by showing its diligence in enforcing its Qualifying Statute. MSA Sec. IX(d)(2).

(Emphasis added.) Thus, the Panel determined, consistent with its interpretation of the MSA, that it lacked authority to create an alternative procedure. This aligns with the decisions from Missouri, Maryland, Pennsylvania, and New Mexico where it was determined the 2003 Panel exceeded its powers by creating a new procedure and this constituted an unauthorized amendment of the MSA.

Finally, the PMs assert the 2022 Reallocation Order impermissibly adds terms to the MSA, essentially that the Panel inserted a "irrebuttable presumption of non-diligence as to Resolved States that cannot be found anywhere in the MSA."

Again, the question before this court is "whether the arbitrator (even arguably) interpreted the parties' contract, not whether [the arbitrator] got its meaning right or wrong." Oxford Health, 569 U.S. at 569. The Panel interpreted MSA §§ IX(d)(2)(A) and

(B) and determined that the Resolved States, because they did not elect to challenge application of the NPM Adjustment by demonstrating diligent enforcement, must be deemed subject to the NPM Adjustment for purposes of calculating reallocation.

While the PMs strenuously oppose the Panel's interpretation of the MSA, the Panel had the authority to interpret the MSA, interpreted the MSA, and determined how to reallocate the 2004 NPM Adjustment. We conclude that the trial court did not err in declining to vacate the award because it correctly concluded that the Panel did not exceed its authority.

C

The PMs assert that they are entitled to vacatur of the 2022 Reallocation Order because the Panel refused to hear pertinent and material evidence. We disagree.

The scope of review under this provision is also narrow. Under the FAA, vacatur is appropriate only when "the arbitrators were guilty of misconduct . . . in refusing to hear evidence pertinent and material to the controversy." 9 U.S.C. § 10(a)(3). "To vacate an award on this ground, the 'misconduct must amount to a denial of fundamental fairness of the arbitration proceeding.'" Fellus v. Sterne, Agee & Leach, Inc., 783 F. Supp. 2d 612, 618 (S.D.N.Y. 2011) (quoting AT&T Corp. v. Tyco Telecomms. (U.S.) Inc., 255 F. Supp. 2d 294, 303 (S.D.N.Y. 2003)).

The Panel explained:

[T]he States that entered the Term Sheet Settlement with the PMs elected not to arbitrate a dispute concerning their diligence before the Panels. The Term Sheet Settlement resolved the disputes between the PMs and those Resolved States relating not only to the 2004 NPM Adjustment, but for the extended period 2003 through 2011. The Term Sheet Settlement entered by the Resolved States contained no discussion of Reallocation, no admission of liability, or agreement between the Parties concerning

-12-

> whether the Resolved States were diligent or non-diligent in the enforcement of their Qualifying Statutes. Moreover, since entering the Term Sheet Settlement, no Resolved State has sought to prove their diligence before this or any tribunal. . . .
>
> The Resolved States have not elected to invoke the option of challenging the application of the NPM Adjustment for 2004 by demonstrating that they diligently enforced the provisions of their Qualifying Statute under MSA Sec. IX(d)(2)(A) and (B). As a result, the Resolved States must be deemed to be subject to the 2004 NPM Adjustment for purposes of calculating reallocation in accord with MSA Sex. IX(d)(1).

Contrary to the PMs assertion, the Panel did not decide to exclude pertinent and material evidence. The Panel determined that the MSA does not provide "for allowing the PMs to assert a diligence claim on behalf of a Resolved State" and the proposed procedure in the interim order in which the PMs would present evidence on the Resolved States diligence in a Phase 2 would constitute an unauthorized amendment of the MSA. Thus, this evidence was irrelevant.[8]

Last, the PMs assert that they were denied due process when the Panel departed from the 2017 Reallocation Order. "In the arbitration context, due process is satisfied so long as the arbitrator provided a fundamentally fair hearing, one that meets the minimal requirements of fairness—adequate notice, a hearing on the evidence and an impartial decision by the arbitrator." Bhd. of Locomotive Eng'rs & Trainmen Gen. Comm. of Adjustment v. Union Pac. R.R. Co., 522 F.3d 746, 751 (7th Cir. 2008)

---

[8] The PMs also challenged the 2022 Reallocation Order on the same grounds in New Mexico. New Mexico II held that "the Panel properly exercised its authority to decide based on its interpretation of the unambiguous language of the MSA that the PMs did not have the right to present evidence regarding or otherwise put at issue in the arbitration, the diligence of the Resolved States." Ord. Denying Defs.' Mot. to Vacate 2004 MSA Arbitration Panel's July 19, 2022 Reallocation Ord., State ex rel. Torrez v. Philip Morris, USA, Inc., No. D-101-cv-1997-01235, at 7 (Santa Fe County 1st Jud. Dist. Ct., N.M. Aug. 30, 2023) (New Mexico II).

(quoting <u>Int'l Bhd. Elec. Workers v. CSX Transp. Inc.</u>, 446 F.3d 714, 720 (7th Cir. 2006)), <u>aff'd</u>, 558 U.S. 67, 130 S. Ct. 584, 175 L. Ed. 2d 428 (2009).

The PMs argue that the Panel's reversal of the 2017 Reallocation Order prejudiced their rights. In support, the PMs cite <u>International Union, United Mine Workers of America v. Marrowbone Development Co.</u>, 232 F.3d 383 (4th Cir. 2000). In <u>Marrowbone</u>, a collective bargaining agreement expressly required the arbitrator to "conduct a hearing in order to hear testimony, receive evidence and consider arguments" if there was a factual dispute involved in the grievance. 232 F.3d at 389. Despite this clear language, and the parties affirmatively acknowledging the existence of factual disputes, the arbitrator never convened the hearing. <u>Marrowbone</u>, 232 F.3d at 389. On appeal, the Fourth Circuit held that this exceeded the arbitrator's authority and denied the union a full and fair hearing. <u>Marrowbone</u>, 232 F.3d at 389.

Unlike in <u>Marrowbone</u>, here, the PMs were not denied due process. The Panel entered the 2017 Reallocation Order on May 25, 2017. Following Maryland's objection to the order, the Panel stayed consideration of the objection until the state-specific hearings were held and all diligence determinations were made. This decision was entered on September 10, 2018. Notably, the PMs agreed to defer consideration of this issue.

Following the state-specific determinations, the Panel then issued a briefing schedule "to comprehensively address all post-Interim Award issues the Parties wished to raise." Idaho, Maryland, New Mexico, Washington, and Wisconsin jointly moved to vacate the 2017 Reallocation Order. Oral arguments were conducted before all judges

of the assigned 2004 NPM Adjustment Panels and they all participated in drafting the 2022 Reallocation Order.

The PMs were on notice in 2018 that this issue had been stayed. Following the state-specific determinations, the PMs had notice and were able to provide briefing and argument on these issues. Thus, the PMs had notice and an opportunity to be heard. Bhd. of Locomotive Eng'rs, 522 F.3d at 751.

We conclude that the trial court did not err in declining to vacate the award because it correctly concluded that the Panel did not fail to consider material evidence.

We affirm.

_____
Mann, J.

WE CONCUR:

_____        _____
Hazelrigg, ACJ                         Smith, C.J.